Matter of Y (A) (2025 NY Slip Op 50689(U))

[*1]

Matter of Y (A)

2025 NY Slip Op 50689(U)

Decided on April 1, 2025

Family Court, Bronx County

Broderick, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 1, 2025
Family Court, Bronx County

In the Matter of Y 
 A Child Under the Age of Eighteen Years Alleged to be Abused and Neglected by A, Respondent.

Docket No. XXXXX

Lauren Broderick, J.

Pending before the Court is a petition filed by the Administration of Children's Services (ACS), "Petitioner" herein, on June 13, 2024, alleging that Ms. A, "Respondent" herein, is the mother of the subject child, Y born in May 2024 and that she abused and neglected the subject child Y. Specifically, the petition alleges that Y was brought to New York Presbyterian Hospital on or about June 2 or June 3 of 2024 by Ms. .A due to her concerns about Y's left arm. The petition alleges that Ms. .A reported that Y's arms were tucked under Ms.A's arms, and after radiological examination it was determined that Y had a displaced fracture of the left humerus bones. Further X-rays demonstrated that Y had one distal femur fracture and one other leg fracture for which Ms. .A has provided no explanation. The petition alleges that these injuries are consistent with non-accidental trauma which would not be sustained absent the acts or omissions of the Ms. A. Finally, the petition alleges that Ms. .A has a history of mental health problems and at the time of filing, she was psychiatrically hospitalized with depression with an unidentified discharge date. 
On June 13, 2024, Y was remanded to the care of the Commissioner of Children's Services and placed in non-kinship care. The agency was directed to provide Ms. A with regular visitation, supervised by the agency or a resource approved by the agency, with discretion to expand. During the pendency of the proceeding, visitation was expanded, without objection, to unsupervised day visits, and then an unsupervised overnight visit. 
A fact-finding trial commenced on November 25, 2024. On December 2, 2024, Respondent filed by way of Order to Show Cause for a 1028 hearing. A combined fact-finding [*2]and 1028 hearing was held on December 5, 2024, December 6, 2024, December 9, 2024, December 10, 2024, December 13, 2024, December 19, 2024, January 3, 2025, January 8, 2025, January 10, 2025, January 15, 2025, January 17, 2025, January 21, 2025, January 24, 2025, January 28, 2025, January 29, 2025, February 5, 2025, February 11, 2025, February 21, 2025, February 25, 2025, February 28, 2025, March 7, 2025, and March 18, 2025. This written decision memorializes the oral decision placed on the record on April 1, 2025.
During the 23 days of the trial, testimony was taken from CPS Ramirez, Case planner Soto, CPS ECS Abreu Rosa, child abuse expert Dr. Brown, pediatric radiologist Dr. Liszewski, emergency medicine Dr. Mitchell, pediatric radiologist Dr. Mack, pediatric orthopedist Dr. Sullivan, and the Respondent Ms. A. The parties entered extensive documentary evidence consisting of medical records for Ms. A and Y, slides prepared by experts, case notes and case law. Petitioner is seeking a finding that the subject child Y is an abused and neglected child who would be at imminent risk if returned to his mother's care. Both the attorneys for Ms. A and for Y have argued there is no imminent risk, and Y should be released to Ms. A's care.
As a threshold matter, the courts have held that a 1028 application can be combined with fact-finding in an Article Ten matter. See In re Kristina R., 21 AD3d 560 (2nd Dept. 2005). Matter of Yahmir G. (Tanisha N.), 48 Misc 3d 1224(A) (Fam. Ct. Bronx 2015). All counsel consented to a combined hearing, as the issues of the credibility of the witnesses and the sufficiency of the evidence overlapped. 
Section 1012 (e)(i) of Family Court Act defines an abused child as a child less than eighteen years of age whose parent or other person legally responsible for his care inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ.
Section 1046 (a)(ii) of the Family Court Act states that in any hearing under this article and article ten-A of this act that proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the care of such child shall be prima facie evidence of child abuse or neglect, as the case may be, of the parent or other person legally responsible.
Section 1012(f)(i)(B) of the Family Court Act defines a neglected child as one less than eighteen years of age whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care in providing the child with proper supervision and guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment.
Petitioner bears the burden of proving the allegations in the petition by a preponderance of the evidence. See FCA 1046[b][i]. "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely than not to have occurred." Matter of Beautisha B., 115 AD3d 854 (2nd Dept. 2014); Matter of Jamie TT., 191A.D.2d 132, 134 (3d Dept. 1993).
Section 1028 of the Family Court Act requires the court grant a Respondent's 
application for the return of a child "unless it finds that returning the 
children would present an imminent risk to the children's life or health." In Nicholson v Scoppetta, 3 NY3d 357 (2004), the Court of Appeals clarified the standard of "imminent risk" and the factors courts must weigh in deciding [*3]applications pursuant to 1028 of the Family Court Act. Specifically, the court must conduct a fact based inquiry to determine whether the "children were actually or imminently harmed by reason of [the parent's] failure to exercise even minimal care in providing them with proper oversight," the court must consider the "special vulnerabilities of the child," and the court must conduct an objective evaluation of parental behavior to determine, "would a reasonable and prudent parent have so acted, or failed to act, under the circumstances then and there existing." Nicholson at 370, 372. 
Pursuant to Nicholson, the court "must do more" than identify the existence of a risk of serious harm. The Court must determine whether imminent risk to the child might be eliminated by other means, such as issuing a temporary order of protection or providing services. Nicholson v Scoppetta, 3 NY3d 357 (2004); Family Court Act § 1027 (b)(iii) (iv). Furthermore, the Court must balance the risk of harm to a child remaining in a parent's care against the risk of harm his or her removal might bring and determine what is in the child's best interest. Nicholson at 378.
Applications pursuant to section 1028 of the Family Court Act may be made no matter the severity of the allegations. Furthermore, courts have released children to respondents even where findings of abuse are entered. See e.g., In re Philip M., 82 NY2d 238 (1993)(where the children were released to the respondents despite an abuse finding based on the children's contraction of a sexually transmitted disease and the respondents had no explanation); Matter of Radames S., 112 AD3d 433 (1st Dept. 2013)(where the court found the respondent mother abused her daughter and derivatively neglected the child's two siblings, based on the finding of skull and humerus fractures, and released the children to respondent's care with 12 months of supervision); Matter of Matthew O., 103 AD3d 67 (1st Dept. 2012)(where the court made findings of abuse where a 5 month old child suffered multiple fractures of her arms, legs and skull, and eventually released the children with orders of supervision). See also, Matter of Maria S. (Samantha S.), 43 Misc 3d 1218(A) (Fam. Ct. 2014).
In the present case the parties have opposing views as to the actual injuries suffered by Y as well as who was responsible for his injuries. However, there is no dispute as to the following facts leading up to the filing of the petition:
(1) Y was born in May 2024, at New York Presbyterian Hospital.
(2) Other then being born by cesarian, there is no indication that Y had an eventful birth or suffered any injury at birth.
(3) Ms. A took Y to his scheduled well visit on May 29, 2024, at a clinic associated with New York Presbyterian Hospital. Y appeared as a healthy child with full mobility of all his limbs.
(4) On June 3, 2024, Ms. A took Y to the emergency room at New York Presbyterian Hospital. The medical records indicate that upon his initial evaluation Y appeared active, was not in acute distress, had decreased movement in his left arm, and no signs of swelling. An X-ray was taken of Y's arm on June 3rd, and although the radiologist had ordered lateral views, those views were not taken. The medical records from June 3rd state radiological findings that Y has no fracture and no dislocation.
(5) An addendum, noting subtle periosteal reaction in the June 3rd X-ray, was added to Y's medical records from New York Presbyterian in December 2024 by Dr. Liszewski.
(6) On June 3, 2024, hospital staff performed two reductions on Y's left arm, after which Y appeared in significant distress.
(7) On June 6, 2024, a full skeletal survey was taken of Y. This skeletal survey clearly demonstrated that Y had a displaced fracture in his left humerus bone. The skeletal survey also showed that Y had two irregularities, one in the corner of the right distal femoral metathesis and one in the corner of his left femoral metathesis.
(8) After the skeletal survey, on June 6, 2024, Dr. Brown, a child abuse expert, and ACS became involved with Y and Ms. A due to concerns of child abuse. Y was removed from Ms. A's care on June 13, 2024, pursuant to court orders.
(9) On June 10, 2024, Ms. A was psychiatrically hospitalized at New York Presbyterian Hospital. Ms. A was diagnosed with depression, (principal problem), and post-partum depression (active problem). Ms. A was discharged on June 25, 2024, with instructions for follow up care at The Bridge PROS and with her OBGYN doctor. Ms.A was prescribed Lithium and Olanzapine.
The Court does not have to determine the extent, or cause, of Y's injuries to decide Ms. A's 1028 application. The evidence presented competing views both about what injuries Y suffered and what caused these injuries. However, the issue before the Court is limited to whether Y's physical and/or emotional health is at imminent risk if he is released to Ms. A. See In re Neveah N., 56 Misc 3d 1212 A (Fam Ct., 2017); Matter of Neriah N., 77 Misc 3d 809 (Fam. Ct., 2022). The ultimate determination about what injuries Y did suffer, and who was responsible for them, is reserved for the fact-finding.
The Court finds Ms. A's testimony credible. Ms. A testified clearly and calmly. Ms. A was never evasive and testified about facts even when they were not favorable. For example, Ms. A acknowledged that she still suffers from depression and can feel sad or isolated. Ms. A answered questions on cross-examination earnestly. Ms. A presented as genuine and dedicated to her son, as she appeared on-time to an enormous number of court dates. 
The Court finds that Ms. A took the steps a loving parent would to care for Y before, and after, his birth. Ms. A testified that she is the mother of two children, Yl and Y. Ms. A has no ACS or child protective history. Ms A testified that when she was pregnant with Y, she moved from the Dominican Republic to New York to live with her mother and siblings, leaving her daughter in the Dominican Republic with her daughter's father. Ms. A testified that she returned to the United States to receive better treatment for her mental health. Ms. A testified that she received prenatal care and participated in counseling with a social worker while pregnant. This information was echoed by CPS Ramirez who testified that Ms. A received prenatal care, attended a program for single mothers, and had provisions for Y. Ms. A testified that she gave birth on May xx, 2024, by cesarean at New York Presbyterian Hospital. Other than it being a c-section, there was no indication that Y's birth was unique in any way. Ms. A. had the necessary provisions to care for Y including a bassinet, car seat, clothing, diapers and wipes. On May 29th Ms. A took Y for a scheduled well-visit where he was deemed a healthy baby. 
On June 3rd, after noticing Y's left arm seemed to be bothering him and speaking with her mother, Ms. A took Y to New York Presbyterian Hospital, the same hospital where he was born. Ms. A acted as a reasonable and prudent parent, taking him to receive emergency medical attention and complying with all testing and procedures, including X-rays, MRIs, and two reductions. Ms. A testified that she agreed to all these procedures because she was, "a concerned mom and all I wanted was help for my son." (Transcript February 25, 2025, page 32). Between June 3rd and June 10th Ms. A only left the hospital once, while her mom was with Y, to shower, [*4]change clothes, and try to rest. During this time Ms. A slept on a couch in Y's room. Even after ACS and Dr. Brown became involved, Ms. A remained compliant, answering all their questions. These are not the actions of a parent who has intentionally caused an injury to their child but rather, the actions of a concerned parent, trying to ensure her child's medical needs are met. 
There are no current physical health concerns for Y and by all accounts he is a healthy baby. Since Y's removal and placement in non-kinship foster care, Ms. A has complied with every referral made to her by the agency. Starting on June 10th, Ms. A consented to her admission to the Psychiatry Unit at New York Presbyterian Hospital. Ms. A testified she agreed because she was sad, crying, and knew she needed help. Upon her discharge she attended follow up appointments at The Bridge and then with a therapist referred to her by case planner Soto at New Horizons. Ms.A remains in counseling and testified that she wants to be in counseling so that she can be healthier for her children. Ms. A acknowledged dealing with depression her entire life. Ms.A testified that there are still times she feels sad and isolated but that she does not have feelings of wanting to hurt herself or losing control. Ms. A testified that she is willing to take medication if prescribed to her. Ms. A testified that her coping skills including going outside, writing in a journal, and reaching out to her therapist. Ms. A never minimized her mental health condition and acknowledged that she needed and wanted help to assist her in treating it.
Additionally, Ms. A completed the parenting classes that she was referred to by the agency and attended visits with Y. The current case planner, Mr. Soto, testified that he supervised Ms. A.'s visits at the agency and that she consistently attended. Furthermore, case planner Soto testified that he has observed visits go well and that during the visits Ms. A cares for Y, is affectionate with Y, and plays with Y. To attend the visits, Ms.A traveled two times a week at least one hour each way by public transportation. Case planner Soto testified that Ms. A has signed all releases requested by the agency and cooperated with home visits. Ms. A's visits have shifted from supervised at the agency, to a resource supervised visit, to unsupervised "sandwich" visits, to unsupervised day long visits, and to even an overnight. The agency did not object to any expansion of visits, and no safety concerns have been raised about any visits.
In a testament to the agency's confidence in Ms. A's caretaking abilities, case planner Soto testified that he wrote a letter in support of Ms. A becoming a home health aide for her sister J. The letter commended Ms. A.'s ability to build a relationship with J, administer her medication, and treat her with compassion. Throughout the pendency of this case and before, Ms. A has been a daily caretaker for her sister J who has Downs Syndrome. She has been responsible for fixing her meals, assisting with personal hygiene, such as showering, and otherwise providing constant supervision for J. Ms. A's testimony about J exhibited both knowledge about her needs and schedule as well the patience and love she has for J. There have been no safety concerns raised regarding Ms.A's care of her 12-year-old sister with special needs, and the agency actively supported such a role.
Upon due consideration of the of the extensive evidence before the court including testimony of competing experts, the review of sizeable documentary evidence including medical records, and the opportunity to assess the credibility of Ms. A, the Court finds that Petitioner has failed to show there is a current imminent risk of harm to the subject child Y if he is released to the care of his mother, Ms. A. The Court is especially cognizant of the high risks associated with the continued removal to Y's ability to attach and bond with his mother. It is in Y's best interest that he be returned to his mother's care. Any concerns raised can be mitigated and addressed [*5]while Y is in his mother's care with ACS supervision.
It is hereby, ORDERED, that the subject child Y, is released to the care of Ms. A with the following terms and conditions:
• Ms. A shall cooperate with ACS and Court supervision including signing releases for herself and Y, comply with announced and unannounced visits, which the agency shall conduct on a weekly basis, and all other reasonable referrals made in writing and on notice to counsel
• Ms. A shall accept a referral for preventative services
• The agency shall assist Ms. A in obtaining a daycare voucher
• Ms. A shall comply with her mental health services as recommended by her provider including, but not limited to, any evaluations, any individual counseling, any group counseling, and medication management
• The agency shall provide a copy of all petitions and court orders to Ms A's mental health evaluators.
• Ms. A shall ensure that Y attends all medical appointments
• Ms. A shall comply with a referral for didactic therapy for her and Y, or any similar parent-child attachment focused therapy
• Ms. A shall provide appropriate supervision of Y at all times and shall not leave Y in the care of any person or provider not approved in advance by Petitioner
• Ms. A shall maintain suitable housing at an address known to the agency
Dated: April 1, 2025
ENTER
Hon. Lauren Broderick , JFC